275 N.J. Super. 530 (1994)
646 A.2d 543
M.D., PLAINTIFF
v.
A.S.L., DEFENDANT.
Superior Court of New Jersey, Chancery Division Family Part.
Decided February 4, 1994.
*531 Wendie L. Elovich, for plaintiff.
Neil S. Rosen, for defendant.
FELDMAN, J.S.C.
This matter involves the rights of parents in choosing the surname of their daughter born out of wedlock.
Dr. L. is the admitted father and Ms. D the mother of the infant child S. The parents had a relationship over several years which terminated during the mother's pregnancy. Upon the birth of the child the mother chose her former married name as the child's surname. (The mother had previously been divorced and retained her married name as do the three children of that union. All the children are in the primary residential care of the mother.)
*532 The father, Dr. L., objects to this surname and requests that the child bear his surname. He intends to exercise meaningful parental access and has agreed to pay child support in an amount that significantly exceeds the cost of rearing the child. He is a medical practitioner who resides on the West Coast, more than 2500 miles from New Jersey. He has arranged his schedule so as to allow him approximately one full week per month to be with his daughter in New Jersey.
Each of the parents have expressed a genuine desire to have the child assume their surname.
Historically, the use of surnames depended primarily on the status of the children, legitimate or illegitimate. Generally speaking the use of surnames did not become common until about the twelfth century although the practice took different forms in different cultures.
In England, for example, surnames often were nothing more than the addition of a suffix to the father's name, a practice also followed in Scandinavian countries. Thus, David the son of John would be called David Johnson. That practice impeded genealogical tracing because David's son Michael would be known as Michael Davidson. However, the use of the same surname for the life of an individual was not a constant. Surnames often changed based upon the occupation or physical characteristic of a party. In semetic cultures the patronymic method was also the norm. Thus, Abdul Ben Ahmed was Abdul the Son of Ahmed. Some cultures used geography as the basis of surnames. Thus, Mario born in Sicily became Mario Siciliano.
During the reign of Henry VIII a regulation was passed requiring parish records of births, deaths and marriages be kept and indexed under the name of the father. In most instances inheritance of property was contingent upon the heir's retention of the family surname. See In re Snook, 2 Hilt. 566, 589 (C.P.N.Y. City & Cty. 1859.
*533 Given the secondary status afforded to women at those times, it is not surprising that the masculine lineage was chosen. Until the enactment of the Married Women's Acts in the mid 19th century, the husband was the sole legal representative of the marriage. Such a distinction based solely on the sex of an individual would not pass constitutional muster today. See, for example, Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (holding Idaho statute giving preference to male over a female in administration of an estate unconstitutional).
In modern society, it has been customary for a child to assume the surname of the father just as it has been customary for a woman to adopt her husband's surname upon marriage. But neither of the propositions have any statutory underpinning. Assuming an agreement between the parents, the child's surname can be the father's, the mother's, both, (either hyphenated or not) or any other surname. In short, there is no statutory basis which would mandate a given result.
The history of illegitimate children follows a different naming pattern. At early common law an illegitimate child was known as a "nullius filius", or "son of nobody".[1] He acquired the name of neither mother nor father and only assumed a surname later in life based on some factor other than lineage. Over a period of time custom decreed that the child usually assumed his mother's surname. Foundlings were just named. (See Oliver Twist, by Charles Dickens, wherein Mr. Bumble proudly describes his methods of naming children.) This assumption of matriarchal surnames paralleled the then traditional view that an unmarried woman possessed greater rights to the child as opposed to the putative father. Suffice it to say, that concept also fails current statutory and constitutional guidelines. New Jersey, by virtue of the adoption of the Uniform Parentage Act, N.J.S.A. 9:17-38, clearly abolished any distinctions between the rights and responsibilities *534 of parentage predicated solely upon the sex of a particular parent.
Some states, however, by statutory law, require the illegitimate child to assume the mother's surname absent an agreement between the parents. (Florida, Georgia, Indiana, Kentucky, Nebraska, New Hampshire, N.Carolina, N.Dakota, Tennessee and Wyoming.) See Richard H. Thornton, Note, Children's Surnames, 23 Utah L.Rev. 303 (1979). (Query as to whether these statutes would withstand constitutional challenge.)
Accordingly we now find ourselves in a position where these two divergent approaches merge and neither parent is presumptively dominant. Who then names the baby and what guidelines are we to follow?
The easiest cases are those wherein the non-custodial parent has exhibited behavior deleterious to the interests of the child. A father who had sexual relations with both his daughters resulting in his conviction and imprisonment was found to have caused such physical and psychological harm to the children that a change in name was warranted. W. v. H., 103 N.J. Super. 24, 246 A.2d 501 (Ch.Div. 1968). Other factors include abandonment of the child, wilful failure to pay support or general indifference to the child's welfare. Sobel v. Sobel, 46 N.J. Super. 284, 287, 134 A.2d 598 (Ch.Div. 1957).
The majority of cases dealing with a requested change of an infant's surname arise by way of a post-divorce application of the former wife asking that the child assume the surname of the new husband. In re Lone, 134 N.J. Super. 213, 338 A.2d 883 (Law Div. 1975) dealt with the ex-wife's application to have the 5 year old assume the step-father's surname. The court in denying the request emphasized that the best interest test of the child be applied. It opined that if the "right" (to have the child retain the father's name) recognizes the father's interest in maintaining his relationship with the child for their mutual benefit. Fearing that the proposed name change might contribute to the estrangement *535 of the child, the court concluded that the child's interest would not be served by the requested change. Id. at 220, 338 A.2d 883.
While generally agreeing with the best interests approach, the court in Application of Rossell by Yacono, 196 N.J. Super. 109, 481 A.2d 602 (Law Div. 1984) rejected the Lone contention of addressing the father's needs as yet another example of gender based inequality. The Yacono court discussed at length the possible effect on the child by not assuming the new family surname and found that the interests of mother and father apply equally and, thus, other extenuating factors must be considered. Yacono, supra. at 115, 481 A.2d 602.
The courts of Ohio and California have enunciated many of the factors to be applied. In Bobo v. Jewell, 38 Ohio St.3d 330, 528 N.E.2d 180 (1988), it was stated that:
In determining the best interest of the child concerning the surname to be used when parents who have never married contest a surname, the courts should consider the length of time that the child has used the surname, the effect the change will have on the father-child and mother-child relationship, the identification of the child as part of a family unit, the embarrassment, discomfort or inconvenience that may result when a child bears a surname different from the custodial parent, the preference of the child if of an age and maturity to express a meaningful preference, and any other factor relevant to the child's best interest.
[Bobo, supra at 185.]
The California courts adopted virtually the same set of standards and articulated that the "symbolic role that a surname other than the natural father's may play in easing relations with a new family should be balanced against the importance of maintaining the biological father-child relationship." In Re Marriage of Schiffman, 28 Cal.3d 640, 169 Cal. Rptr. 918, 620 P.2d 579 (1980).
The issue as to the best interests of the child thus becomes fact sensitive. Here the infant will be living primarily with the mother and her three half-siblings. The child, although having a different father is still going to be an integral part of a large family unit. What purpose could it possibly serve to have the child bear a surname unique from all other members of that unit?
*536 Further, the safety of the child mandates this result. There is no local nexus to the father (or his name) and should the child be required to verbally identify herself she should be using a "locally identifiable" name.
It is true that we live in a society of expanding and fragmented family relationships. Marriage can no longer be viewed as a forever proposition. Relationships end all too quickly. It is the obligation of the legal system to bring as much normalcy to the life of children as possible. In this instance, allowing the child to retain her mother's surname accomplishes that. The geographic distance between mother and father, coupled with the child's physical custody with her mother and siblings, mandate this result. The infant has never used her father's name and there is no traumatic event in changing from one name to another.
The child's middle name shall be changed to include the father's surname if that is his desire. Anything that can reinforce the bonds between the child and her individual parents is to be encouraged, provided that the focus is through the eyes and needs of the child.
NOTES
[1] Blackstone Commentaries, 459.