Cite as 2022 Ark. App. 495

# ARKANSAS COURT OF APPEALS
## DIVISION II
No. CV-22-65

| | |
|---|---|
| ASHLEY ATKINS EDMONDS<br>APPELLANT<br><br>V.<br><br>CHRISTOPHER MILLER<br>APPELLEE | Opinion Delivered December 7, 2022<br><br>APPEAL FROM THE ASHLEY COUNTY CIRCUIT COURT [NO. 02DR-12-147]<br><br>HONORABLE LAURIE A. BRIDEWELL, JUDGE<br><br>AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Ashley Edmonds appeals the Ashley County Circuit Court's order granting appellee Christopher Miller's change-of-custody motion and changing the surname of the parties' minor child. Ashley argues that (1) she was entitled to the presumption in favor of relocation; (2) even if the presumption did not apply, it was not in the child's best interest to change custody; and (3) the trial court erred by changing the child's surname. We affirm.

## I. *Facts*

On May 2, 2012, the minor child was born, and on May 29, Christopher filed a paternity petition claiming to be the child's father and asking that the child's surname be changed to "Miller." Ashley agreed that Christopher is the child's father but resisted the name change. After a hearing, the trial court issued an order on January 7, 2013, establishing that Christopher is the child's father and awarding "joint custody of the minor child with

[Ashley] to have physical custody." Christopher was ordered to pay child support, specific visitation was established, and the request for a name change was denied.

On February 11, 2021, Christopher moved to change custody, enjoin Ashley from relocating, and change the child's surname. He alleged that since the paternity order, the parties have shared "roughly equal physical" custody of the child and that Ashley's intention to move to Crossett from El Dorado would frustrate their joint-custodial arrangement. He alleged a material change in circumstances in that Ashley had failed to appropriately address the medical, dental, and educational needs of the child. He claimed that Ashley had subjected the child to a sometimes violent relationship between her and her husband, had moved many times, and had failed to participate in or attend the child's school functions and events. He asked that the child be given his surname, "Miller"; that his child-support obligation be terminated; and that Ashley be ordered to pay child support.

A hearing was held on September 20, and in its "Findings of Fact and Conclusions of Law," the trial court summarized the facts and testimony. The court found in pertinent part as follows:

> [Christopher] enjoyed between 50% to 60% of the time with [the child] between the first grade through the first semester of the third grade. This continued until Ashley unilaterally cut him off in January of 2021 and forced a return to the 2013 order. . . . Ashley's return to the 2013 order by her own testimony was detrimental to [the child]. In addition, the time sharing could not be duplicated when [Ashley] moved over an hour away in May 2021 . . . to Ashley County.

> While Ashley testified that [the child] did not spend as much time with [Christopher] as [he] claimed, her own testimony was inconsistent and controverted by most of the evidence. Ashley admits that [the child] became accustomed to his time with his father and enjoyed it.

2

In March, [Ashley] pulled [the child] out of regular JCCS [Junction City Charter School] where he was beginning his third nine weeks of third grade, and placed him in JCCS virtual school. When school concluded in May, [Ashley] left Union County and moved [the child] to Ashley County, mooting [Christopher's] request for an injunction. By the time of trial, she had enrolled [the child] in Anderson Elementary in Crossett.

During the years in El Dorado, the Court finds that Ashley not only relied upon, but completely defaulted to Christopher's wife, Carrie, to handle all of [the child's] educational needs. . . .

In spite of overwhelming evidence to the contrary, Ashley denies that she ever knew that [the child] tested positive with indicators for dyslexia or that a 504 Plan was implemented for [the child] in the first grade. It is incredulous to this Court, in view of the testimony of Carrie Miller , School Counselor Belva Cannon, and Second Grade Teacher Connie Hammett, that by the time [the child] finished the third grade, [Ashley] still did not know about her child had tested positive for dyslexia. . . . Part of the 504 Plan included assistance for [the child] by going to a resources class while in school where he received help with his class room work, 30–45 minutes a day, five days a week. [Ashley] knew nothing about this.

. . . The record proves [Ashley's] aversion to driving [the child] to school and the Court can only conclude that [Ashley's] motive for virtual school, in light of her fallout with the Millers, was based on the best interest of [Ashley] not [the child].

. . . As [the child] begins fourth grade, he now has all Cs and one A [as opposed to his A/B average at JCCS]. No evidence was shown to the Court that the Crossett schools have a clue that [the child] has any learning difficulties or that he qualifies for classroom modifications under any 504 Plan. The Court has no confidence that [Ashley] will be able to 'work with him' as she claims to pull these grades up.

. . . .

. . . [Ashley] seems to see nothing wrong with counseling [the child] to punch other kids in the mouth if he thinks he is being bullied at school. . . . There seems to be no thought process as to the ramifications to [the child] if he acts on these impulses in a school setting.

. . . [Ashley] lied to this Court about her disciplinary practices with [the child]. . . . [T]he Court must wonder about the credibility of [Ashley's] other testimony.

Further, it is noted that Christopher and [the child] lost their extra time together for no good reason well before [Ashley] moved to Crossett because of [Ashley's] anger. . . .

While her reasons for stopping the extra days were very clear, Ashley's reasons for moving were not. . . .

Ashley said her main reason for the move is to get out from under a $1,000 rent payment in El Dorado even though the trailer payment is $1,423 per month. . . .

Ashley also did not work in El Dorado; she does not work now. . .. On the other hand, her husband still works some 60 hours per week in El Dorado and commutes between El Dorado and Crossett to his job. . ..

. . . .

[Ashley] further opposes changing [the child's] last name to "Miller." In 2013, [Ashley's] last name was "Atkins." Since that time, her last name has changed to "Edmonds." Her daughter's last name is "Edmonds." [The child] is the only one in the household with the last name of "Atkins." [Christopher's] argument for a name change is that in his household, [the child's] half-brother's last name is "Miller." The only person with substantial ties to the name of "Atkins" is the minor child's grandfather who has just been released on early parole from federal prison after conviction of embezzlement of approximately $400,000 from Georgia Pacific and right now, resides with [Ashley]. [Christopher] argues that the name of "Atkins" now has a negative association because of his grandfather's conviction involving the largest employer in Ashley County, that no one in the child's immediate family is named "Atkins," and that if he is living with [Christopher], it would make more sense and be less confusing for [the child] if he has the same name as his father and his brother, who attends the same school.

[Ashley] argues that [the child's] identity is already established as "Atkins," that only about fifty per cent of the people in Ashley County believe the conviction of her father and the other fifty per cent believe he is innocent, and that the name "Miller" doesn't have such a sterling reputation, although she did not elaborate.

In its conclusions of law, the trial court discussed whether the presumption in favor

of allowing Ashley to relocate as stated in *Hollandsworth v. Knyzewski*, 353 Ark. 470, 109

4

S.W.3d 653 (2003), applies or whether this is a joint-custody case controlled by *Singletary v. Singletary*, 2013 Ark. 506, 431 S.W.3d 234. The trial court concluded that Christopher proved that the child spent more time with him than with Ashley between 2018 and 2021 and that the child did not spend significantly more time with Ashley than with Christopher. The court applied *Singletary* rather than *Hollandsworth*, found that Ashley's move to Crossett is a material change in circumstances, and found that it is in the child's best interest to change custody to Christopher. The trial court held that even if *Hollandsworth* did apply, Christopher overcame the presumption and proved that Ashley's relocation with the child is detrimental to the child. The court awarded joint custody with Christopher having primary physical custody, and Ashley was awarded specific visitation. Ashley was ordered to pay $263 a month in child support, and the trial court partially granted the request to change the child's name. The court found,

> While the Court does find that the minor child has somewhat of an identity linked to "Atkins," he is only nine years old. The older he gets, the more confusing his surname can be when no one in either household retains that last name. In addition, due to this ruling, [the child] will be going to school full time with his half-brother whose last name is "Miller," as well as living in a household full time where everyone's last name is "Miller." "Atkins," at this time, understandably has special meaning for [Ashley] and her family and has meaning for [the child] as well. The Court thinks the better course is not to eliminate the name "Atkins" altogether. The minor child's name should retain something of both his parents. Therefore, the Court finds that the best interest of [the child] is served by adding the surname of "Miller[.]"

On October 12, Ashley moved for reconsideration and a new trial, and on October 29, she filed a notice of appeal. On November 9, the trial court filed an order granting Christopher's motion to change custody and incorporated the September 29 findings of fact

5

and conclusions of law. On November 15, Ashley filed an amended notice of appeal, and this appeal timely followed.

## II. *Standard of Review*

This court recently held,

> In reviewing child-custody cases, we consider the evidence de novo, but we will not reverse the circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Cooper v. Kalkwarf*, 2017 Ark. 331, 532 S.W.3d 58. A finding is clearly erroneous when, despite supporting evidence in the record, the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Id.* Our court gives due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Id.* This deference is even greater in cases involving child custody, as a heavier burden is placed on the circuit judge to use his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.*

> In determining whether a parent may relocate with a minor child, a circuit court must generally look to the principles set forth in our supreme court's decision in *Hollandsworth*, 353 Ark. 470, 109 S.W.3d 653, and *Singletary*, 2013 Ark. 506, 431 S.W.3d 234. In *Hollandsworth*, the supreme court announced a presumption in favor of relocation for custodial parents with sole or primary custody, with the noncustodial parent having the burden to rebut this presumption. In *Singletary*, the court explained that the *Hollandsworth* presumption does not apply when the parents share joint custody of a child. In a joint-custody arrangement where both parents spend equal time with the child, there is not one parent-child relationship to take preference over the other, and as such, the *Hollandsworth* rationale does not apply. The supreme court clarified its prior holdings in *Cooper*, *supra*, by holding that the *Hollandsworth* presumption should be applied only when the parent seeking to relocate is not just labeled the "primary" custodian in the initial custody order but also spends "significantly more time" with the child than the other parent. *Cooper*, 2017 Ark. 331, at 15, 532 S.W.3d at 67. The court noted that a joint-custody arrangement does not necessarily involve a precise "50/50" division of time. *Id.* Parental influence, commitment, and involvement in the child's activities and responsibility for making decisions on behalf of the child are also important factors for the circuit court to consider in a relocation request. *Id.*

> The proper analysis for a change-in-custody request due to the relocation of one parent in a joint-custody situation is the same as that when relocation is not

6

involved; the court must first determine whether a material change in circumstances has transpired since the initial custody order and then whether the change in custody is in the best interest of the child. *Armstrong v. Draper*, 2019 Ark. App. 114, 571 S.W.3d 60.

*Schnick v. Russell*, 2022 Ark. App. 212, at 7–8, 645 S.W.3d 345, 349–50.

### III. *Favorable-Presumption Argument*

Ashley argues that the presumption in *Hollandsworth* in favor of relocation for custodial parents with primary custody applies so that her move to Crossett was not a material change in circumstances. She contends that in *Singletary*, the supreme court first looked to the divorce decree to determine whether the parties had a joint-custody arrangement. *Singletary*, 2013 Ark. 506, at 9, 431 S.W.3d at 240. Ashley argues that the paternity order granted the parties joint custody and gave her "physical custody." Accordingly, she contends that the order is ambiguous on its face, and other parts of the contract, the testimony, and conduct of the parties must be used to resolve the ambiguity. *Id.* at 11, 431 S.W.3d at 241.

Ashley contends that the paternity order provides that Christopher pay child support of one hundred dollars a week and grants him standard visitation; thus, she claims that the order does not reflect a joint-custody agreement. She also argues that the parties' general course of conduct since the entry of the 2013 paternity order does not indicate that they shared joint custody. She originally lived in Crossett, then she moved to Sheridan in 2015, and Christopher had visitation under the guidelines of the order. When she moved to Star City, they continued to "generally abide" by the order, with Christopher keeping the child

7

for a "week or two at a time." She contends that once she moved to El Dorado in 2017 or early 2018, Christopher would pick up the child on the Friday afternoon of his weekend and keep the child until Monday, when he would be taken to school. Christopher also had him every Wednesday night and any additional days that Ashley needed him to do so. Christopher and Carrie kept the child from Wednesday through the next weekend "multiple times." Carrie also testified that she kept records of the time they had the child in 2019 and 2020. Ashley argues that this evidence, even accepting Christopher's and Carrie's testimony as true, does not reflect a joint-custody arrangement. She contends that the situation is more akin to *Hollandsworth*, with weekend and holiday visitation and more liberal visitation outside the agreed schedule.

Ashley argues that Christopher did not overcome the presumption in favor of her move; therefore, the move was not a material change of circumstances. She cites the factors used to determine whether relocation by a custodial parent is a material change in circumstances. *Hollandsworth*, 353 Ark. at 485, 109 S.W.3d at 663–64. She argues that her reasons for moving to Crossett are valid—it is the town where she was living when the original order was issued; she owns land there instead of renting; she and her husband purchased a modular home and placed it on her land; and her family lives in Crossett.

She maintains that Christopher did not offer evidence that the educational, health, and leisure opportunities in Crossett were significantly different from those available to the child in El Dorado or at JCCS. She argues that Christopher's visitation schedule as the noncustodial parent will not be significantly affected by her move. She contends that the

8

move will only have a positive effect on the child's relationships with extended family and that the move is less burdensome to Christopher than the situation in *Hollandsworth*, where the move was five hundred miles. She argues that Christopher failed to meet the burden to show that the relocation is a material change of circumstances.

Christopher argues that the trial court correctly found that *Singletary* rather than *Hollandsworth* applied. The trial court's order states,

> In *Singletary*, the *Hollandsworth* presumption does not apply where the parents spend essentially equal time with the minor child. The proper analysis for a change of custody in those cases where there is a relocation by one parent is to look first at whether there has been a material change of circumstances and then whether the change of custody is in the best interest of the minor child.

The trial court found that Christopher proved the minor child spent more time with him between 2018 and January 2021, and we hold that this finding is not clearly erroneous. Accordingly, the trial court's joint-custody analysis under *Singletary*—rather than *Hollandsworth*—was correct. The trial court properly addressed whether a material change of circumstances had been created by Ashley's decision to move the child to Crossett and whether it was in the child's best interest to change custody. *Schnick*, 2022 Ark. App. 212, at 8, 645 S.W.3d at 350. The trial court found that Ashley's move created a material change in circumstances because her relocation thwarted the shared-custody arrangement to which the child had become accustomed; further, the child was removed from a school that had been addressing the child's dyslexia and placed in a school that was not made aware of the issue. Thus, we affirm the trial court's finding that Ashley was not entitled to a presumption in favor of relocation and that a material change in circumstances was proved.

9

IV. *Best-Interest Argument*

Ashley argues that even if the *Hollandsworth* presumption does not apply, the child's best interest does not necessitate a custody change. *Stehle v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009) (affirming trial court's determination that mother failed to prove a material change of circumstances to justify custody change). She contends that instability due to frequent moves by the custodial parent was a concern in *Stehle*, but it was not enough to justify a change in custody. Further, she asserts that she now owns a home located on her own land. She argues that when the paternity order was filed, the child was not of school age and that Christopher's concern over the child's education is not due to any action on her part but a result of the child's normal growth. She contends that the child's grades have not drastically changed—he had three Cs and one A in Crossett; and when he attended JCCD, he made As, Bs, and Cs. She claims that there are no concerns about the child's medical or dental issues that she is not able and willing to address, and Christopher's and Carrie's participation in taking care of those needs while the child lived in El Dorado does not meet the stringent requirements necessary to change custody. Further, she argues that as in *Stehle*, there was no allegation of violence directed toward the child or Ashley from Ashley's husband. Finally, she argues that there was no evidence of physical abuse and that she admitted spanking the child. Her husband testified that he heard her spank the child with a belt twice in six years, and Christopher admitted that he has spanked the child as much as twice in the previous year. She argues that these concerns and allegations are not a material change in circumstances.

10

However, we agree with Christopher's contention that this matter is not simply a relocation case, and the trial court received ample evidence of a material change in circumstances and that it was in the child's best interest to change custody to him. The trial court found that, even if the presumption did apply, Christopher overcame the presumption and proved that Ashley's relocation would be detrimental to the child. There was a plethora of evidence that the child had better educational opportunities if he remained in JCCS, and Ashley testified that she was not even aware that the child had a Section 504 plan. Carrie testified that the child was screened for dyslexia and received a Section 504 plan in the first grade and that she and Ashley had discussed it. The child's teacher testified that Ashley attended the meeting regarding the child's Section 504 modifications at the beginning of the child's second-grade year. When the child went to virtual learning in the second semester of his third-grade year, the child did not receive any tutoring services for his dyslexia. Ashley testified that she had not done anything to address her concern that the child has dyslexia. When the child was placed in virtual school, he got thirty-nine assignments behind in schoolwork. Ashley testified that Carrie was the one who saw that the child completed the assignments and that Carrie had been tending to all the educational needs of the child. Despite her admission that extra time with Christopher was good for the child, Ashley unilaterally forced a change back to standard visitation in January 2021.

The trial court found that Ashley lacked credibility. This court gives due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Schnick*, *supra*. This deference is even greater in cases involving child custody, as a heavier

11

burden is placed on the trial court to use its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.* Accordingly, the trial court's best-interest finding is affirmed.

V. *Name Change*

Ashley argues that the trial court failed to conduct an inquiry into the required factors for a child's name change and that there was insufficient evidence to justify the change. In *Huffman v. Fisher*, 337 Ark. 58, 68–69, 987 S.W.2d 269, 274 (1999), the trial court granted the noncustodial father's request that his child's surname be changed, and the Arkansas Supreme Court reversed and remanded for the trial court to address the factors as follows:

> The body of case law surrounding this inquiry has produced a compelling list of factors to be considered when addressing a petition to change the surname of a minor child. We hold that in determining the child's best interest, which must ultimately be the controlling consideration in any change in status, the trial court should consider at least the following factors: (1) the child's preference; (2) the effect of the change of the child's surname on the preservation and development of the child's relationship with each parent; (3) the length of time the child has borne a given name; (4) the degree of community respect associated with the present and proposed surnames; (5) the difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname; and (6) the existence of any parental misconduct or neglect. *Barabas v. Rogers*, 868 S.W.2d 283 (Tenn. Ct. App. 1993); *Daves v. Nastos*, 711 P.2d 314, 318 (Wash. 1985); *In re Saxton*, 309 N.W.2d 298 (Minn. 1981); *In re Marriage of Schiffman*, 620 P.2d 579 (Cal. 1980); *In re Harris*, 236 S.E.2d 426 (W. Va. 1977) (Harschbarger, J., concurring). *See also* 57 Am. Jur. 2d *Name* §§ 46–54 (1988).

> . . . Where a full inquiry is made by the chancellor of the implication of these factors and a determination is made with due regard to the best interest of the child, the chancellor's decision will be upheld so long as it is not clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *RAD–Razorback Ltd. P'ship v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986) (citations omitted).

Ashley asserts that the trial court "perhaps" addressed the first factor, stating that "Atkins" has meaning for the child and that he has "somewhat of an identity" linked to the name. She contends that no evidence was presented regarding the preference of the child. She argues that, as in *Huffman*, the only factor the trial court addressed was the difficulties, harassment, and embarrassment the child might experience from bearing the name "Atkins" when it stated that the name would be confusing as he ages and that no other person in either household shares his name. She contends that inconclusive evidence was presented regarding the degree of community respect associated with either name but that the trial court did not address that factor.

Christopher argues that the name change should be affirmed and that under *Carter v. Reddell*, 75 Ark. App. 8, 52 S.W.3d 506 (2001), relevant evidence, other than the *Huffman* factors, may be considered. We agree. In *Carter*, the court considered that the father voluntarily acknowledged paternity shortly after the child's birth and expressed an interest at that time that the child's name be his own; he and his family exercised visitation as regularly as he was allowed; he had paid child support and agreed to pay increased child support when requested; and he paid for the child's health insurance. *Id.* at 14, 52 S.W.3d at 510.

In this case, the child was born on May 2, 2012, and on May 29, Christopher filed a paternity petition seeking to change the child's surname to "Miller." There was testimony that Ashley's father, Ken Atkins, had been incarcerated in federal prison for four years after

his conviction for money laundering and wire fraud for embezzling over $400,000 from Georgia Pacific. Atkins was paroled on May 13, 2021, and is currently living with Ashley. Ashley goes by the surname "Edmonds." Christopher testified that he does not want the child's name tied to someone who lies and steals, and Christopher testified that he has made his last name a good one to have. His employer testified that Christopher is a "fine young man as I've ever met." The surname "Atkins" is not shared by either of the child's parents or his half siblings. No evidence was presented about the child's preference, and the child is only nine years old. Accordingly, the trial court's decision to grant the name change, adding "Miller," is not clearly erroneous.

Affirmed.

ABRAMSON and MURPHY, JJ., agree.

*Gregory Thomas Attorney at Law PLC*, by: *Gregory M. Thomas*, for appellant.

*Stone & Sawyer, PLLC*, by: *Phillip A. Stone*, for appellee.