Kara Kathleen HUFFMAN *v.* John Nicholas FISHER

00-906                                   38 S.W.3d 327

Supreme Court of Arkansas
Opinion delivered February 22, 2001

*Easley, Hicky & Hudson*, by: *B. Michael Easley*; and *Barrett & Deacon*, by: *D.P. Marshall Jr.* and *Leigh M. Chiles*, for appellant.

*Ford & Glover*, by: *Robert M. Ford*, for appellee.

ANNABELLE CLINTON IMBER, Justice. Kara Kathleen Huffman appeals the order of the Cross County Chancery Court changing the name of her minor child from Jacob Auston Huffman to Jacob Auston Fisher. This is the second time that this case has been before us. In *Huffman v. Fisher*, 337 Ark. 58, 987 S.W.2d 269 (1999) (*Huffman I*),[1] we reversed the order of the chancery court changing the child's name and remanded with instructions to consider six enumerated factors in deciding whether to change the child's name.

We related the facts giving rise to these appeals in *Huffman I*:

> Appellant Kara Kathleen Huffman was sixteen years old and unmarried when she gave birth to a son on May 18, 1996. She named her son Jacob Austen (sic) Huffman and filed a Certificate of Birth with the Arkansas Department of Health listing appellee John Nicholas Fisher ("Nick") as the father. In August, 1996, the Arkansas Office of Child Support Enforcement filed suit on behalf of Kara against Nick for child support. Nick filed a third-party complaint in which he admitted that he was the child's father, and he asked that child support be set and reasonable visitation be established. He also requested that the child's surname be changed to Fisher.

> At a hearing on April 23, 1997, before the Cross County Chancery Court, several witnesses testified concerning whether the child's surname should be changed from his custodial parent's surname to his father's surname. The trial court summarized the testimony and its findings in a letter opinion filed on June 3, 1997. The trial court found that Nick had not paid any child support since Jacob's birth except for $100.00, although his parents had paid a portion of Kara's lying-in expenses. The trial court also found that Nick had encouraged Kara, a Catholic, to have an abortion, and that he had counseled her to keep her condition from her parents. Furthermore, there was testimony that Nick had

---

[1] This appeal originated in the Court of Appeals, which affirmed the trial court as a result of an evenly divided *en banc* decision. *Huffman v. Fisher*, 63 Ark. App. 174, 976 S.W.2d 401 (1998). We granted Ms. Huffman's petition for review pursuant to Ark. Sup. Ct. R. 1-2(e)(i).

become angry with Kara for getting pregnant and that he had ridiculed her physical appearance during the pregnancy. Since Jacob's birth, the Fishers had exercised visitation with Jacob in their home on alternate Saturdays from 10:00 a.m. until 6:00 p.m.

Nick testified at trial that he wanted Jacob's surname to be changed to Fisher because "that's how I grew up" and he didn't think he, as a father, should be treated any differently because he had a child out of wedlock. He wanted the child's name changed because there was the possibility that Kara would marry in the future and take her husband's name, leaving Jacob with a name different from his mother's. Finally, he stated that Jacob would be better labeled with a different name from the Huffman family that would be raising him.

Nick's uncle testified that the Fisher family was a good family and that it would be the proper thing for Jacob to bear the Fisher name, although he could think of no advantage or disadvantage to having one name as opposed to the other. Nick's father testified that it would be awkward for *Nick* to explain to others why the child bore his mother's last name, but that such a scenario probably wouldn't arise for Kara, and that it was only right for the child to be known as Fisher.

Kara Huffman testified that Nick had not provided her with any financial or emotional support during her pregnancy and that she had made the decision to name Jacob with her family name because he would be raised in her family and would spend his life with her. Kara further offered to retain her maiden name in the event she chose to marry in the future if it would be in Jacob's best interest.

*Huffman I*, 337 Ark. at 60-62, 987 S.W.2d at 270.

The trial court, in *Huffman I*, determined that it was in the best interest of Jacob to take the surname of his father because of the court's concern that Jacob would experience stigma in his adolescence if he retained his mother's surname. *Id*. 337 Ark. at 62, 987 S.W.2d at 270. The court reached this decision because "the norm in this locale" is that children take the paternal surname and because Kara might some day marry and take her husband's surname, leaving Jacob with no connection by name to either parent. *Id*. 337 Ark. at 63, 987 S.W.2d at 271.

■■ We reversed, noting that speculation as to what Kara's future holds and the "norm in the locale" are insufficient reasons to change a child's name. *Huffman I*, 337 Ark. at 70, 987 S.W.2d at 275. We also rejected Kara's argument that we adopt a presumption in favor of the surname chosen for a child by the custodial parent. *Id.* Rather, we held that the only relevant inquiry in determining whether to change the surname of a minor child is what is in that child's best interest. *Id.* 337 Ark. at 66, 987 S.W.2d at 273. The burden of proof is on the moving party to demonstrate that the change is in the best interest of the child. *Id.* 337 Ark. at 69, 987 S.W.2d at 274. Finally, we held that the chancery court must make this determination on a case-by-case basis through "thoughtful and careful consideration" of at least six factors that we enumerated to g uide chancery courts in the decision. *Id.* 337 Ark. at 70, 987 S.W.2d at 275. The six factors to be considered are:

> (1) the child's preference;
> (2) the effect of the change of the child's surname on the preservation and development of the child's relationship with each parent;
> (3) the length of time the child has borne a given name;
> (4) the degree of community respect associated with the present and proposed surnames;
> (5) the difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname; and
> (6) the existence of any parental misconduct or neglect.

*Huffman I*, 337 Ark. at 68, 987 S.W.2d at 274.

Upon remand, the case was tried again with the presentation of additional evidence and testimony. Mr. Fisher's family members testified that it was their belief that Jacob's name should be changed to Fisher in order to provide Jacob with a sense of connection to the Fisher family and because there was no certainty that Kara would not marry and take another name in the future. If Kara did remarry, the Fishers were concerned that Jacob would be left with a surname that connected him to neither of his parents. Whereas, Nick's surname would always be Fisher, so Jacob would not face that situation as a Fisher.

Dr. Mary Elizabeth Boeckmann, the principal of Wynne Primary School, testified on behalf of Mr. Fisher that thirty-five percent of the kindergarten students in Wynne Primary School are

from single-parent households. Some of these households are single parent as a result of divorce, others are the result of unwed parents. Of the thirty-five percent of kindergarten students from single-parent households, Dr. Boeckmann testified that about eight percent carry their mother's maiden name, whereas twenty-seven percent carry their father's surname. Dr. Boeckmann testified that Jacob carrying his mother's surname could potentially cause him embarrassment at school, not because the Huffman name is not respected, but because he could be subjected to ridicule and embarrassing questions about why he does not have his father's name. She testified that it could be a sign of illegitimacy that could cause him embarrassment and comment from other students as he grew older. Although Dr. Boeckmann was unable to identify any specific instance in which she knew of a child to have faced any real problems for that reason, she did testify that children in her school commonly question other children regarding their names and parentage.

Roger Fisher, Nick Fisher's uncle, testified to knowledge from his days as a county judge of an incident in which a child in the juvenile system, whose records he was reviewing, had been ridiculed because of his name even though the child was from a good family.

Ms. Huffman also presented the testimony of family and friends. They testified that it would be better for Jacob to keep the Huffman name because he was a part of the Huffman life on a daily basis and visited the Fishers only on weekends and during the summer. Ms. Huffman testified that Jacob identifies himself as Jacob Huffman because his preschool class calls him by his full name in order to avoid confusion with another Jacob in his class. According to Ms. Huffman, Jacob came home from preschool one day and told her that his name was Jacob Huffman.

Dr. Rolan Irwin, a clinical psychologist with a Ph.D in psychology whose clinical practice involves the treatment of both adults and children, testified as an expert on Ms. Huffman's behalf. It was his testimony that by three and one-half years of age, the age of Jacob at the time of the hearing, a child has begun to develop a sense of identity, or a self-concept, integral to which is the child's knowledge of his name, his household mates, and his family. Dr. Irwin testified that changing Jacob's name at this point in his life

might create confusion and disrupt his development of a positive self-concept. Dr. Irwin also acknowledged, however, that Jacob may face ridicule by other children because he does not have his father's name. Although Dr. Irwin believed the present risk of damaging Jacob's sense of self-identity outweighed the future risk that he may face ridicule, he admitted that he had never treated a child for problems associated with a name change.

Following retrial, the chancery court again decided, in a letter opinion filed on January 14, 2000, that changing Jacob's surname to Fisher is in Jacob's best interest. In support of this decision, the trial court made the following findings of fact:

(1) Jacob is too young to have a considered opinion as to which name he preferred.

(2) Jacob spends the majority of his life with the maternal side of his family. No proof was offered which would indicate that a surname change from Huffman to Fisher would have a detrimental effect on Jacob's relationship with his mother and her family. Nick did testify that he felt Jacob would form a second connection to him if he had the name Fisher. There would be no detrimental effect on Jacob concerning the preservation of his relationship with either Nick or Kara if his name was changed to Fisher.

(3) Although Jacob has had the name Huffman for 3 1/2 years, this action has been pending the entire time.

(4) Both surnames were equally respected in the community.

(5) Jacob would not face any harassment or embarrassment if his surname is changed to Fisher; but he might if his name is not changed.

(6) There is no parental neglect or misconduct from either party.

Based upon these findings and conclusions, the trial court entered an order on March 1, 2000, directing that Jacob's surname be changed to Fisher. Ms. Huffman appeals, contending that the chancellor erred in the conclusions he drew when applying four of the *Huffman I* factors.[2]

---

[2] No challenge has been raised to the chancery court's finding that Jacob is too young to have an informed preference as to which name he bears or to the finding that both family names are equally respected in the community. These two factors, therefore, inure to the benefit of neither party and we will not discuss them further. We are in no way suggesting, however, that these two factors are not necessary to future determinations in name-change cases.

■ "Where a full inquiry is made by the chancellor of the implication of [the *Huffman I*] factors and a determination is made with due regard to the best interest of the child, the chancellor's decision will be upheld so long as it is not clearly erroneous." *Huffman I*, 337 Ark. at 69, 987 S.W.2d at 274. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Rad Razorback Ltd. Partnership v. B. G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 463 (1986).

Ms. Huffman first argues that the chancellor erroneously gave no weight to the substantial length of time that Jacob has borne the Huffman surname. She asserts that the now four and one-half years that Jacob has carried the name Huffman should weigh heavily against changing his name to Fisher. In support of her argument, Ms. Huffman directs this court's attention to our decision in *Reaves v. Herman*, 309 Ark. 370, 830 S.W.2d 860 (1992), wherein we upheld a chancellor's decision that it was in the best interest of the child to keep "the surname he [had] carried since birth." However, as previously stated, the determination of what is in the child's best interest is a decision that must be made on a case-by-case basis with due consideration to the specific facts and relationships involved in each case. *Huffman I*, 337 Ark. at 70, 987 S.W.2d at 275.

■ In *Reaves v. Herman, supra,* the facts were significantly different than in the present case. For instance, unlike in the case at hand, the father of the child in *Reaves* was unwilling to accept paternity of the child until some time after his birth. *Reaves v. Herman*, 309 Ark. at 373, 830 S.W.2d at 861. In contrast, Mr. Fisher has accepted Jacob and been involved in his life from birth. The testimony reveals that, unlike the father in *Reaves*, Mr. Fisher was present at the hospital when Jacob was born, visited Jacob daily in Memphis until he was released to go home, and has been a significant part of Jacob's life ever since. Even more significant, however, is the fact that since our decision in *Reaves v. Herman, supra,* we have more clearly outlined the factors that the trial court should consider in determining whether a change of a minor child's surname is in the best interest of the child, and we have adopted the clearly erroneous standard of review. *Huffman I, supra.* "These holdings necessarily modify and clarify our holding in *Reaves.*" *Huffman I*, 337 Ark at 69, 987 S.W.2d at 274. Pursuant to our

holdings in *Huffman I*, the length of time that a minor child has held a name is but one of the factors to be considered by the trial court.

■ Furthermore, we note that the chancellor decided not to weigh the length of time that Jacob's name had been Huffman in either party's favor because this case has been pending for most of Jacob's life. This litigation began when Jacob was only three months old. To hold that the fact that Jacob is now over four years old weighs determinatively in the favor of one party would only encourage lengthy proceedings and reward stalling tactics by any party arguing against changing a child's name. The chancellor recognized in his letter opinion that, as of that time, Jacob was three and one-half years old; however, the chancellor also recognized that this action began when Jacob was only three months old. Because Mr. Fisher has never denied paternity, has actively participated in Jacob's life since birth, and has pursued this litigation for most of Jacob's life, and pursuant to our holdings in *Huffman I*, we are not firmly convinced that the chancellor erred in affording no weight to the length of time that Jacob has borne the Huffman surname.

Second, Ms. Huffman argues that the chancellor erred in evaluating the evidence of the impact that changing Jacob's surname would have on the child's relationship with each parent. The chancellor found that there was no proof that changing Jacob's surname would in any way harm his relationship with his mother or detrimentally affect his relationship with either parent. On the other hand, the trial court found that changing Jacob's surname to Fisher would afford Jacob "a second connection to Nick as the only other connection Jacob has with his father is the visitation time."

■ Ms. Huffman's continued reliance upon the New Jersey Supreme Court's decision in *Gubernat v. Deremer*, 140 N.J. 130 (1995), 657 A.2d 856 (1995), is misplaced. Although factually similar to the case at hand and cited by this court in *Huffman I* for its historical survey on the use of surnames, the *Gubernat* court adopted a strong presumption in favor of the surname chosen by the custodial parent. *Id.* 140 N.J. at 144, 657 A.2d at 869. In *Huffman I*, we specifically rejected such a presumption, and we declared that the determination of whether a change of surname is in the child's best interest must be made by the chancellor on a case-by-case basis. *Huffman I, supra,* 337 Ark. at 70, 987 S.W.2d at 275. In so holding, we relied upon our previous holding in *McCullough v. Henderson*,

304 Ark. 689, 691, 804 S.W.2d 368, 369 (1991), "that 'a rule which makes the result automatic would be neither prudent nor consistent with the established traditions of the law.' " *Huffman I, supra,* 337 Ark. at 70, 987 S.W.2d at 275. Moreover, the Arkansas Court of Appeals reached a similar conclusion in *Mathews v. Oglesby,* 59 Ark. App. 127, 952 S.W.2d 684 (1997): "When the best interests of a child are at stake, the chancellor should look into the peculiar circumstances of each case and act as the welfare of the child appears to require." *Id.* 59 Ark. App. at 130, 952 S.W.2d at 685.

Ms. Huffman argues that by citing the "connection" to the noncustodial parent as the reason for changing Jacob's name, the chancellor did precisely what we rejected in *Huffman I;* that is, the reason given by the chancellor amounts to nothing more than a preference for a particular party because the noncustodial parent will always be able to assert the need for a stronger "connection" with the child. Certainly, we agree with Ms. Huffman that a chancery court must be careful not to allow testimony regarding the need to "connect" with a noncustodial parent to become a *de facto* presumption in favor of the noncustodial parent. We reiterate that we have declined to adopt a presumption in favor of either parent. *Huffman I, supra.* "[A]n inflexible resolution will not serve the best interest of the children involved." *Huffman I,* 337 Ark. at 70, 987 S.W.2d at 275. "[A]n individualized determination" based upon "thoughtful and careful consideration of the factors" is required in each case. *Id.* The record indicates that the chancellor undertook such an inquiry in this case.

Presented with circumstances that are somewhat atypical of child name-change cases, the chancellor determined that the increased connection Jacob would feel toward his father supported changing Jacob's surname. The chancellor was faced with two involved, loving parents, each having taken full responsibility from the moment the child was born, each asserting that they would love the child in any case. In weighing the evidence, the chancellor determined that a change to the paternal surname would not adversely affect Jacob's relationship with his mother, but that it would enhance the development of his relationship with his father by providing an additional link with Mr. Fisher beyond weekend visitations. Considering this evidence along with the evidence relating to the other relevant factors, we cannot say that the chancellor's decision in this regard was clear error.

Third, Ms. Huffman argues that the chancellor erred in finding that Jacob might suffer harassment or embarrassment if his name is not changed, while "closing its eyes" to the testimony of Dr. Irwin that Jacob may suffer harm if his surname is changed. In *Huffman I, supra,* we directed the chancellor to consider the "difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname," based on the evidence presented in this case. *Id.* 337 Ark. at 68, 987 S.W.2d at 274. Both parties presented the testimony of expert witnesses. The two experts agreed that Jacob might suffer ridicule at the hands of his peers and the community as a result of not having his father's surname. According to Dr. Boeckmann, it is typical in Wynne for children to take the paternal surname, and a child who does not bear his father's surname may be stigmatized as illegitimate. While Ms. Huffman's witness, Dr. Irwin, a child psychologist, testified that in his opinion the risks associated with a name change on the formation of Jacob's self-concept outweighed the risk of future ridicule, the chancellor afforded more weight to the testimony of Dr. Boeckmann.

■ Ms. Huffman asserts that the chancellor's determination regarding the potential for ridicule and embarrassment was based solely on evidence of the "norm in the locale" with regard to a child taking his father's surname. We rejected such evidence as a sole basis for changing a child's surname in *Huffman I,* 337 Ark. at 70, 987 S.W.2d at 275. However, we held that evidence of what is normal in a particular locale may be relevant in determining whether a child may experience difficulties, harassment, or embarrassment from bearing a particular surname. *Id.* Although the statistical evidence presented in this case by Dr. Boeckmann demonstrated that the norm in Jacob's school was for children to have the paternal surname, we do not agree that the "norm in the locale" was the determinative factor in the chancellor's ruling. In determining whether Jacob could face difficulties, harassment, or embarrassment with either name, the chancellor considered expert testimony that was tangentially related to the norm in the locale, but not comprised solely of local norms. Dr. Irwin testified that there was a possibility that Jacob would suffer embarrassment in the future if he did not have his father's surname, though he felt that changing Jacob's name had the potential for greater harm. Dr. Boeckmann, a primary school principal, when asked whether she

had seen significant problems with ridicule in the primary school setting, testified, "We might have teasing, like, 'Who's your daddy? Why don't you have a daddy?' Those type questions are asked at a younger age." Dr. Boekmann also testified that the teasing could get worse as Jacob grows older because older children are more likely to be cruel.

██ In his letter opinion, the chancellor specifically stated that he found Dr. Boeckmann's testimony to be more credible than Dr. Irwin's. It follows that the chancellor was more convinced of the potential harm to Jacob from the ridicule of his peers than of the potential harm to his self-image by changing his name at such a young age. We will defer to the chancellor's "superior position to judge the credibility of the witnesses and weigh their testimony." *Southeast Arkansas Landfill, Inc. v. State,* 313 Ark. 669, 858 S.W.2d 665 (1993); *Nicholson v. Century,* 307 Ark. 161, 818 S.W.2d 254 (1991). The evidence supports the chancellor's conclusion that Jacob may suffer difficulties, harassment, or embarrassment if he were to retain his maternal surname. We, therefore, find no clear error.[3]

██ Finally, Ms. Huffman asserts that the chancellor erred by finding no misconduct by Mr. Fisher prior to Jacob's birth. Specifically, the chancellor found that there was no parental misconduct or neglect on either side in this case, although he did take notice that both parents exhibited behavior prior to Jacob's birth that, though consistent with their ages and the difficult circumstances in which they found themselves as teenage parents, could be construed as misconduct. Specifically, Mr. Fisher encouraged Ms. Huffman repeatedly to have an abortion, urged her to hide the pregnancy, and ridiculed her appearance; Ms. Huffman continued to play competitive sports, kept the pregnancy hidden from her parents, and failed to obtain prenatal care. However, because the chancellor also recognized that Mr. Fisher and Ms. Huffman have both been dedicated, loving parents since Jacob's birth, he attributed no misconduct to either party. Accordingly, we conclude that it was not clearly erroneous for the chancellor to attribute no weight to the

---

[3] We reiterate that it is incumbent upon the trial court to distinguish between mere evidence of the "norm in the locale" and evidence that actually demonstrates the potential for difficulties in the child's future. This is a narrow, but essential, distinction that we find to have been made in this case.

misconduct of Mr. Fisher that occurred prior to Jacob's birth, just as he attributed no weight to evidence that could be construed as misconduct by Ms. Huffman.

█ Ultimately, the chancellor can only weigh the factors for which the parties provide evidence or that are relevant under the circumstances. In this case, (1) because of Jacob's age, the child's preference was not applicable; (2) the evidence supported the chancellor's determination that changing Jacob's surname would have no detrimental effect on his relationship with his mother, but would strengthen the bond the child had with his father; (3) there was no error in giving no weight under the circumstances of this case to the length of time the child·has borne a given name; (4) there is no difference in the degree of community respect associated with either name; thus, a conclusion based on this element does not inure to the benefit of either party; (5) the testimony of expert witnesses combined with statistical "norm in the locale" evidence supported the chancellor's finding that Jacob was likely to suffer difficulties as a result of peer ridicule as he grows older; and (6) the chancellor did not err in holding both parents blameless of misconduct or neglect. After weighing all the relevant factors, the chancellor decided that in the aggregate, particularly with respect to the development of Jacob's relationships with his parents and the potential for future difficulty and embarrassment, a name change was in Jacob's best interest. For the reasons stated above, we cannot say the chancellor was clearly erroneous.

Affirmed.