Tatum GANGI *v.* Jody EDMONDS

CA 04-831                                     218 S.W.3d 339

Court of Appeals of Arkansas
Opinion delivered November 30, 2005

*Terrence Cain* and *Skarda Law Firm*, by: *Cecily Skarda*, for appellant.

*J. Slocum Pickell*, for appellee.

SAM BIRD, Judge. Appellant, Tatum Gangi, appeals an order entered by the Lincoln County Circuit Court on April 7, 2004, which granted the petition of appellee, Jody Edmonds, to change the name of the parties' minor child from Gangi to Edmonds and to modify visitation, and which denied appellant's motion for an increase in child support. The order incorporated by reference a letter opinion written by the circuit court on February 26, 2004. Appellant presents two issues for our review. First, appellant argues that the circuit court erred in granting the surname change as it was not in the best interest of the child. Second, appellant argues that the trial court abused its discretion in denying her request for an increase in child support. We reverse the order changing the child's surname, and we dismiss the appeal of the order denying an increase in child support.

### Change of Surnames

In *Huffman v. Fisher*, 337 Ark. 58, 987 S.W.2d 269 (1999) (referred to in this opinion as *Huffman I*), our supreme court applied the best-interest analysis when a party sought to change a child's surname. The court enumerated the following factors that a trial court should consider in determining a child's best interest:

> (1) the child's preference; (2) the effect of the change of the child's surname on the preservation and development of the child's relationship with each parent; (3) the length of time the child has borne a given name; (4) the degree of community respect associated with the present and proposed surnames; (5) the difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname; and (6) the existence of any parental misconduct or neglect.

*Id*. at 68, 987 S.W.2d at 274.

Where a full inquiry is made by the trial court regarding the implication of these factors and a determination is made with due regard to the best interest of the child, the trial court's decision will be upheld where it is not clearly erroneous. *Carter v. Reddell*, 75 Ark. App. 8, 52 S.W.3d 506 (2001). A finding is clearly erroneous when, although there is evidence to support it, upon reviewing the entire evidence the court is left with a definite and firm conviction that a mistake has been committed. *Id*. The burden of proof is on

the moving party to demonstrate that the name change is in the best interest of the child. *Matthews v. Smith*, 80 Ark. App. 396, 97 S.W.3d 418 (2003).

After purporting to apply the six *Huffman I* factors, the trial court found that it was in the best interest of the child that his surname be changed to Edmonds. However, from our examination of the record in this case, it does not appear that the trial court considered three of the six factors at all, finding Factors 1 and 3 to be inapplicable, and finding that no evidence was presented as to Factor 4. Furthermore, it appears that the trial court misapplied Factor 2 by effectively imposing upon appellant the burden of proving that changing the child's surname will not negatively harm the child's relationship with her. Finally, the court's findings as to the remaining two factors (Factors 5 and 6) are clearly erroneous in that they are not supported by any evidence, much less a preponderance of it.

■ Our view of the trial court's analysis of the six *Huffman I* factors is as follows:

1. *The child's preference.* The trial court concluded that because the child "is barely two years of age at this time . . . his preference . . . is not a factor that will be considered by the court." Although it is understandable that there would not be an abundance of evidence on the issue of a twenty-seven-month-old child's choice of names, the court erred in ignoring the evidence relating to this factor that was presented. It was undisputed that the child had been known as Dawson Gangi since his birth, and there was undisputed evidence that the child would answer "Dawson Gangi" when he was asked, "Dawson, what is your name?" Contrary to the conclusion of the trial court, we believe that there is significant evidence on this issue in that the child knows his name and is able to tell people what it is; and it is no great leap, and does not require resort to speculation, to logically conclude that Dawson Gangi would prefer to be known to others by the same name as he knows himself. The court erred in finding this evidence, which was the only evidence presented on this factor, to be insignificant.

2. *The effect of the name change on the preservation and development of the child's relationship with each parent.* The trial court made two findings regarding Factor 2: first, that there was no evidence that the name change would negatively harm the child's relationship with his mother; second, that there was evidence that chang-

ing the child's surname would strengthen his bond with his father. The first finding misses the mark. This factor of *Huffman I* requires the consideration of evidence that a child's name change will preserve and develop the child's relationship with each parent. As already noted, the burden of proof is on the party seeking to change the child's name. The trial court effectively reversed the burden of proof by requiring appellant to produce evidence that the name change would *not* negatively harm the child's relationship with her, and then found that there was no such evidence. That was error.

The trial court's second finding under Factor 2 is also erroneous. The trial court did not identify any evidence it had considered in finding that the name change would strengthen the child's bond with his father, appellee does not refer to any evidence in the record that supports the trial court's finding, and we have searched the record in vain for any such evidence. The *only* evidence even mentioned by appellee on the issue of changing the child's name was appellee's testimony that he had "a lot of pride" in his name, it had "always been important to me that my son has my name," and "he will know that I am his father." Nor did appellee present any evidence to suggest that his bond with his son will be any less preserved or developed if his son's name were not changed. The trial court's findings as to the second *Huffman I* factor are clearly erroneous.

3. *The length of time the child has borne his present surname.* The only evidence presented on this issue is that the child's name had been Gangi from the time of his birth twenty-seven months earlier, and that it was long enough for him to know and recognize his name. For reasons expressed above under our discussion of Factor 1, the court erred in disregarding this evidence.

4. *The degree of community respect associated with the present and proposed surnames.* The trial court found that there was no evidence either way on this issue. This is inaccurate. While we agree that there was no such evidence relating to the Gangi name in Benton County, where appellant's family resides, there was an abundance of negative evidence bearing on appellee's name in Lincoln County, where appellee resides. Appellee testified to a wide range of driving violations and alcohol offenses, admitting that he had "a deplorable driving record," having "totaled a truck," having "three or four accidents and tickets" on his record, and incurring a DWI in 2002 that resulted in the suspension of his driver's license. He admitted to having been charged with resisting arrest and

obstructing government operations, and he admitted to having been charged in 2003 with disorderly conduct when attending a bachelor party. He even admitted guilt to the allegation that he had on several occasions let his then-less-than-two-year-old son sit on his lap and "drive" his truck from his house to that of his parents. While claiming to be a full-time student, appellee admitted that in his preceding school year he failed all of his courses one semester and that the next semester he dropped all of his courses but one, receiving a D grade in the one course that he did not drop.

In addition to these admissions by appellee, appellant testified to appellee's history of marijuana and alcohol abuse, initially in Fayetteville and later in Lincoln County. Even if the trial court assigned little weight or credibility to this testimony, as it was entitled to do, there was still ample evidence for the court to consider in determining the degree of community respect associated with appellee's surname. We do not understand how the trial court could conclude that "there was no evidence" that the Edmonds surname "would be anything other than respected" in Lincoln County. There was no evidence introduced as to what degree of community respect, if any, the Edmonds surname had in the Star City community, and we note that it was appellee's burden to produce such evidence.

5. *The difficulties, harassment, or embarrassment that the child may experience for bearing the present or proposed surname.* The trial court found this factor significant, stating that it was adopting the logic of this point as discussed in *Huffman v. Fisher*, 343 Ark. 737, 38 S.W.3d 327 (2001) (*Huffman II*). In *Huffman II*, however, the supreme court noted that evidence was presented that supported the trial court's decision. That evidence consisted of the testimony of the primary school principal in the town where the Huffmans and Fishers resided to the effect that, in her school, thirty-five percent of the children were from single-parent households, of which twenty-seven percent bore their father's surname and only eight percent bore their mother's surname. The principal testified that carrying a mother's surname could potentially lead to ridicule and embarrassment for the child. The supreme court's discussion in *Huffman II* focused on the evidence presented of the effect in Wynne, Arkansas, of a child's taking its mother's or father's surname; the testimony of each party's expert witness, a child psychologist and a primary-school principal, as to potential harm from ridicule of the child's peers; and the appellate court's defer-

ence to the trial court's superior position to judge the credibility and weight of the experts' testimony.

Here, the trial court stated:

> Should [the child] continue to bear his mother's name, everyone would certainly know that his parents had not been married or that the identity of his father was unknown. Certainly, either of these prospects would likely cause embarrassment for him in the future. On the other hand, should he bear his father's surname, the normal supposition would be that his parents had merely divorced.

The trial court did not discuss any evidence, expert or otherwise, in support of these conclusory statements. Nor does appellee point to any evidence that could support these findings. In our view, the trial court's finding regarding the fifth *Huffman* factor is not supported by any evidence and is, therefore, erroneous.

6. *The existence of any parental misconduct or neglect.* It appears to us that the trial court erroneously applied this factor. The evidence clearly shows a consistent theme in this case of appellee's misconduct and neglect toward appellant and the child.

After becoming pregnant in Fayetteville, appellant moved with appellee to Star City when three pounds of marijuana were seized at the Fayetteville apartment appellee had shared with roommates. In Star City, appellee engaged in verbal abuse of appellant throughout her pregnancy, saying that her mother was a whore, that "nothing could come better from her than a whore," and "Lord, I hope this isn't a girl." When appellee broke his promise to quit selling drugs and to let appellant continue with college, she went to her parents' home in northwest Arkansas. Appellee did not see appellant during the last three months of her pregnancy, including during her hospitalization for a couple of days when the baby was not moving, although at one point he was in Fayetteville and was involved in an incident at a bar. Appellant asked him to attend her scheduled delivery, which he did; however, he was two hours late, stayed about an hour before leaving to celebrate with friends, visited the next day for only thirty minutes before leaving for a party in Russellville, and did not see appellant again for a month.

Appellant moved back to Star City a month and a half after the child was born because appellee promised her that he would not do drugs anymore. He broke this promise, using crystal

methamphetamine and marijuana with his friends, and he did not get a job. The couple lived together but he was rarely there, made little money, and hardly ever went to class; he took her car keys so that she and the baby could not go anywhere. On Super Bowl Sunday in 2002, appellee was drinking and had friends over who smoked marijuana in the front yard; appellant let it be known that she wanted them to leave. Appellee shook her while she was holding the baby, told her that she had ruined everything, and continued to shake her despite her requests to put the baby down.

In May 2002, after finding a photograph of a male friend of appellant's from Fayetteville among her belongings, appellee put appellant's belongings in garbage bags and put her and their five-month-old baby out of the house at two o'clock in the morning. She had no money and obtained formula from a neighbor. Friends in Jefferson County took her in until her father drove from Bentonville to get her. While appellant lived in Bentonville, appellee telephoned and threatened harm to her father if he showed up in Star City. In the year preceding trial, appellee gave the child no gifts or clothing, except for a t-shirt that he later wanted back.

After appellant married, appellee was involved in a verbal incident with the couple in front of a Cracker Barrel restaurant. Appellee cursed and pointed aggressively while holding the baby, he pulled the child out of appellant's grasp before giving him to her, and appellee spit in appellant's husband's direction and "flipped him off." In an incident mentioned earlier in this opinion, appellee was observed driving a vehicle with the child in his lap instead of in a car seat in September 2003.

In her brief to this court, appellant characterizes the above evidence as an "avalanche of misconduct." We agree with appellant that the evidence supports her position that appellee exhibited parental misconduct and neglect such as to weigh heavily against changing the child's surname to that of his father.

While the trial court seems to have been impressed that appellee initiated the court action to establish his paternity, it ignores the fact that appellee initially urged appellant to abort the child, which she refused to do. The trial court also ignored that appellee, after initiating the paternity action, in which he alleged that he "believed" that he was the child's father but sought DNA testing to confirm it, accused appellant of deceiving him into believing he was the father, and he contended that the real father

was a friend of appellant's from Fayetteville whose photograph resembled the baby. Far from seeking to establish paternity for the purpose of accepting his responsibility as the child's father, it appears that appellee sought to use the paternity action as a means to establish that he was not the father of appellant's child.

Although the trial court relied on *Huffman I* as the basis for its decision to change the child's surname, it disregarded facts that distinguish it from the *Huffman* cases. In the *Huffman* cases, the child's parents were teenage high school students residing in Wynne, Arkansas, where they and the child continued to reside. Here, when the child was conceived, the parents were students at the University of Arkansas in Fayetteville, with appellee's residence being Star City in Lincoln County and appellant's residence being Bentonville in Benton County. They did not begin cohabiting in Star City until after appellant had become pregnant in Fayetteville and appellee agreed to settle down, stop drinking and using drugs, and get a job. Unfortunately, he did not do any of those things. When appellee's boisterous life style continued, and after tolerating three months of physical and verbal abuse from appellee, appellant left Star City and returned to her family home in Bentonville where she remained until the child was born. Although the trial court notes that appellee attended the child's birth, it ignores that he was two hours late for what was to have been a scheduled birth, remained for only a little more than an hour, and returned the next day for thirty minutes before leaving for Russellville to attend a party and football game. He did not see appellee or the baby again for almost a month.

When the child was six weeks old, appellant agreed to move back to Star City and reside with appellee in reliance upon appellee's promise that he would quit drinking and using drugs and would attend school at the University of Arkansas at Monticello. He did not keep his promise. After about three months, appellee discovered the above-mentioned photograph of appellant's Fayetteville friend, noted the friend's resemblance to the baby, proclaimed to his and appellant's parents that he was not the child's father, and threw appellant out of the house at 2:00 a.m. one morning in early May 2002. They have not resided together since that date.

We note that appellee did not initiate the present action to change the child's name until the child was almost twenty months old, and that appellee alleged, as his only bases for such a change, that he had maintained a loving and close relationship with the

child, and that appellant had married and the child no longer bore the surname of either parent. However, there was evidence that, although appellant had married a man named Baker, she had adopted the name "Gangi-Baker" as her surname for the purpose of retaining her identity with the child's surname. Furthermore, the marriage of a child's mother and her consequent assumption of her husband's surname, as is customary in this state, should not provide a basis for changing the child's surname to that of his father, where no such consequence may be triggered by the father's marriage.

## Child Support

■ For her second point on appeal, appellant argues that the trial court abused its discretion when it denied her motion to increase appellee's child-support obligation. Her motion requesting increased child support was denied in an order filed January 23, 2004, but appellant did not appeal from that order. Rather, appellant filed her notice of appeal on April 26, 2004, appealing only from the April 6, 2004, order relating to the change of her child's surname. Her notice of appeal does not mention the January 23, 2004, order that denied her request for increased child support. Arkansas Rule of Appellate Procedure–Civil 4(a) (2004) requires that a notice of appeal be filed within thirty days from the entry of the order appealed. Appellant's notice of appeal was untimely to appeal the order denying an increase in child support. Therefore, we lack jurisdiction to review that order, and we must dismiss that appeal.

Reversed in part, and dismissed in part.

HART, GLOVER, and CRABTREE, JJ., agree.

GRIFFEN and ROAF, JJ., dissent.

WENDELL GRIFFIN, Judge, dissenting. Unfortunately, the majority has assumed the role of a "super trial court." The role of an appellate court is to review the lower court's proceedings for error, not make its own findings of fact. As a result, appellate judges must sometimes conclude that, while we might have decided a case differently, the trial court decision must be affirmed under the applicable standard of review. In today's opinion, the majority has neglected the applicable standard of review. I must respectfully dissent.

In *Huffman v. Fisher*, 337 Ark. 58, 987 S.W.2d 269 (1999) (*Huffman I*), our supreme court held that a circuit court's findings regarding a name-change petition are reviewed under the clearly-erroneous standard. In other words, the circuit court's ruling must be upheld unless "the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Id.* at 69, 987 S.W.2d at 274 (citing *RAD-Razorback Ltd. Partnership v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986)). Further, a reviewing court is supposed to defer to the circuit court's superior position to judge the credibility of the witnesses and weigh their testimony. *Huffman v. Fisher*, 343 Ark. 737, 38 S.W.3d 327 (2001) (*Huffman II*). The standard of review in traditional cases of equity, such as domestic-relations proceedings, contemplates that the reviewing court may disagree with the circuit court's decision but is obligated to affirm it unless clear error exists.

As stated in the majority opinion, when considering whether a change in a minor child's surname is in the best interest of that child, a court should consider at least the following factors:

> (1) the child's preference; (2) the effect of the change of the child's surname on the preservation and development of the child's relationship with each parent; (3) the length of time the child has borne a given name; (4) the degree of community respect associated with the present and proposed surnames; (5) the difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname; and (6) the existence of any parental misconduct or neglect.

*Huffman I*, 337 Ark. at 68, 987 S.W.2d at 274.

*1. The child's preference.* The majority finds error in the circuit court's ruling that the child was too young to have a preference because he had been known as "Dawson Gangi" all of his life and that, when asked his name, he responds "Dawson Gangi." Not only has the majority substituted its own judgment for that of the circuit court's when analyzing this factor, it has disregarded that in *Huffman II*, the circuit court also found that the child, age three-and-one-half years at the time, was too young to have an opinion as to which name he preferred. The supreme court affirmed the circuit court's decision to change the child's surname to that of the father. The majority does not hide the fact that it is assuming the role of fact-finder when it states:

> Contrary to the conclusion of the trial court, we believe that there is significant evidence on this (child preference) issue in that the child knows his name, is able to tell people what it is; and it is no great leap, and does not require resort to speculation, to logically conclude that Dawson Gangi would prefer to be known to others by the same name as he knows himself. The court erred in finding this evidence, which is the only evidence presented on this factor, to be insignificant.

This reasoning is flawed for at least two reasons. First, while the majority finds error in the circuit court's decision to find the evidence on the child-preference factor insignificant, the circuit court actually declared that it was not going to consider the factor because of Dawson's age. Had the circuit court considered the factor regardless of Dawson's age, it might have agreed with the majority; however, that was a decision for the circuit court to make, and given Dawson's age, the circuit court's finding was not clearly erroneous.

Further, by declaring that Dawson would prefer the surname Gangi simply because he knows himself by that name, the majority engages in rank speculation. The majority cites no testimony or authority to support its conclusion. Aside from the fact that there is no proof showing why the child's preference is what the majority imagines it to be, the majority does not explain why its rationale would not essentially always make the preference of two-year-old children binding on circuit courts entrusted with determining whether it would be in the best interest of such children to grant petitions to change their surnames. While I agree that the circuit court should not disregard evidence dealing with the child's preference, the fact that a circuit court comes to the conclusion that a factor is not relevant is not the equivalent to a court not considering the factor at all. *See Bell v. Wardell*, 72 Ark. App. 94, 34 S.W.3d 745 (2000). There is no reason to make the child's preference more than what *Huffman I* made it to be: one factor among six that circuit courts should consider when determining whether it would be in the child's best interest to grant a petition to change a child's surname.

*2. The effect of the name change on the preservation and development of the child's relationship with each parent.* The majority finds error in the circuit court's finding and opines (1) that the circuit court effectively reversed the burden of proof by requiring appellant to produce evidence that the name change would not negatively harm the child and (2) that the circuit court did not identify any

evidence that it had considered in finding that the name change would strengthen Dawson's bond with his father. However, the majority misconstrues the circuit court's findings.

The circuit court merely found that there was no evidence that the surname change would negatively harm the child's relationship with appellant. That finding is both logically permissible and factually substantiated. The majority has cited no authority that forbids a party who seeks to prove that a surname change will not harm the relationship between the child and a parent from meeting its burden by proving that no harm in the relationship between the child and a parent is likely to occur. Proof by the petitioner that no harm is likely to result in the relationship between the child and a parent by the surname change does not reverse the burden of proof; however, such proof might induce a party opposing the petition to produce evidence to the contrary. The circuit court's statement regarding this point did not operate to reverse the burden of proof; it was simply an assessment of the proof on this matter.

The majority does acknowledge appellee's feelings regarding the bond that he would have with Dawson by Dawson having his surname. This court should be mindful of the circuit court's analysis of this factor in *Huffman II*:

> Jacob spends the majority of his life with the maternal side of his family. No proof was offered which would indicate that a surname change from Huffman [the mother] to Fisher [the father] would have a detrimental effect on Jacob's relationship with his mother and her family. Nick did testify that he felt Jacob would form a second connection to him if he had the name Fisher. There would be no detrimental effect on Jacob concerning the preservation of his relationship with either Nick or Kara if his name was changed to Fisher.

*Huffman II*, 343 Ark. at 744, 38 S.W.3d at 330. If *Huffman II* was affirmed, then I see no reason why this court should reverse with similar evidence before it on this factor.

*3. The length of time the child has borne his present surname.* The majority finds error in the circuit court's ruling because Dawson had borne his surname for twenty-seven months, long enough for him to recognize his name. Again, the majority is substituting its own judgment for that of the trier-of-fact. This court has previously affirmed a name-change petition when the child was four

years old, stating that there would be little stigma if the child's surname were changed prior to the child's attendance in kindergarten. *See Carter v. Reddell*, 75 Ark. App. 8, 52 S.W.3d 506 (2001). Even in the original *Huffman* cases, the child had his prior surname for three-and-a-half years before the circuit court granted the petition for a name change on remand from the supreme court. I acknowledge that the *Huffman* litigation had been pending the entire life of the child, while appellee did not initiate name-change proceedings until Dawson was twenty months old. Again, the circuit court's finding on this point was not clearly erroneous, only different from what the majority (and appellant) prefer.

4. *The degree of community respect associated with the present and proposed surnames.* Out of all of the factors, the majority's analysis of this factor is most puzzling. The majority has elected to search the record for evidence of this factor *despite appellant's concession in her brief that neither party presented any evidence regarding the reputation of either family name in their respective communities.* However, the majority now finds that there was ample evidence for the circuit court to consider this factor based on evidence of appellant's driving, criminal, and academic histories. Nevertheless, this factor refers to the degree of *community respect.* The majority has cited no evidence proving lack of community respect for the Edmonds name in Lincoln County. Yes, the majority has listed appellee's prior bad acts. But, there was no evidence that the community knew about that conduct, let alone viewed the conduct as a curse on the Edmonds name. If there was no evidence that the community knew about any of these acts, then how exactly is this factor implicated? I see no reason to find that the circuit court's ruling was clearly erroneous in its analysis of this factor.

5. *The difficulties, harassment, or embarrassment that the child may experience for bearing the present or proposed surname.* The majority holds that the evidence did not allow for an inference similar to what was affirmed in *Huffman II*; in other words, the majority holds that it was error for the circuit court to conclude that Dawson would suffer difficulties by bearing his mother's surname. Without conceding that the circuit court's analysis of this point was improper — because it does not require speculation to assume that a child with the mother's surname would receive questions about his familial status — I still do not agree that it is the majority's role to act as fact-finder and reverse this case based on the different conclusions reached.

The majority appears to be impressed by the fact that appellant had adopted the name "Gangi-Baker"; however, the trial court also considered the following testimony on the issue:

APPELLEE'S COUNSEL: Would you state your name, please.

APPELLANT: Tatum Mae Gangi.

COUNSEL: All right. And is it Baker now?

APPELLANT: No, sir.

COUNSEL: Okay. I thought at one point you were married.

APPELLANT: Yes, sir, I am married. I kept — I'm retaining my last name.

COUNSEL: Okay.

APPELLANT: Gangi. It's a family name.

COUNSEL: Okay. Well, the reason I — okay. Were you — did you take the name of Baker at one time?

APPELLANT: No. I got married. I haven't changed my name. My social security is still Tatum Gangi.

COUNSEL: Okay. Do you go by the name of Baker?

APPELLANT: Some people call me Mrs. Baker. Some people — a lot of people still call me Tatum Gangi. I'm self-employed with my business and it is all Tatum Gangi.

.   .   .

COUNSEL: Okay. The reason I asked about your name is, is that — are you aware that there have been pleadings filed by you in this case under the name of Tatum Baker? Are you aware of that?[1]

---

[1] The majority ignores several court documents where appellant is referred to as "Tatum Baker." These documents include an affidavit dated September 29, 2003 (just a little over a month prior to the November 10, 2003, hearing), wherein appellant refers to herself as "Tatum Baker."

APPELLANT: Well, I, all of a sudden, was being addressed as Tatum Baker from the other side, and I just — no, but I've seen Tatum Baker, and I still see Tatum Gangi on the sheets that come from the courtroom. They come in both forms.

COUNSEL: But you — and when you sign off on documents, do you sign off as Tatum Gangi?

APPELLANT: Yes, Tatum Gangi *or Tatum Baker. On my checkbook, I sign Tatum Baker,* but sometimes I sign Gangi too.

COUNSEL: Okay. The reason I asked is —

APPELLANT: For work.

COUNSEL: — is you remember the motion for ex parte order for drug testing that was filed the beginning of last month.

APPELLANT: Um-hum.

COUNSEL: You were seeking to have Mr. Edmonds drug tested. Do you remember that?

APPELLANT: Um-hum.

COUNSEL: That was filed under the name Tatum Baker. Do you remember that?

APPELLANT: Yes, I do.

COUNSEL: *And do you remember also that the affidavit that you attached to the motion was signed not as Tatum Gangi, but as Tatum Baker. Do you remember that?*

APPELLANT: *Yes.* For all — for all intents and purposes, retaining my child's name to be Dawson Gangi, I'm keeping the name Gangi, and I will no longer ever again go by Tatum Baker.

COUNSEL: Okay. But you have gone —

APPELLANT: I have, yes, sir.

. . .

COUNSEL: When were you married, by the way?

APPELLANT: February the 8th.

COUNSEL: Okay. *And when did you stop using the name Baker?*

APPELLANT: *Stop. I've only used it a — I don't — I use both. I've always used both.*

(Emphasis added.)

Appellant may have stated that she went by "Tatum Gangi," but when confronted with evidence to the contrary, she admitted that she went by both Gangi and Baker. It does not take speculation to recognize the difficulties posed to a child with a surname unlike that of both parents. The circuit court was not clearly erroneous when it found that Dawson would have fewer difficulties if he assumed his father's surname.

*6. The existence of any parental misconduct or neglect.* The majority spends more space addressing this point than any other. A person reading only the majority opinion would think that the circuit court failed to consider any of the evidence on this point. On the contrary, the circuit court was very mindful of it:

> The Court has had opportunity to observe the parties as they testified and has also been able to assess their credibility. The Court finds that [appellee] has successfully explained [appellant's] allegations concerning his alleged misconduct and the Court accepts those as adequate. The Court further will accept his assurances that he will not transport Dawson without being properly restrained in a car seat in the future.

The circuit court could have interpreted the testimony as the majority has in this case; however, it did not do so, choosing to accept appellee's explanations of the allegations. The majority completely ignores appellee's testimony that he has had his driving privileges restored, that he will no longer allow Dawson to sit in his lap while he drives, that he denied all other allegations of misconduct, and that he

told the circuit court that appellant repeatedly threatened to move Dawson out of state to thwart his visitation. In other words, the majority shows absolutely no deference to the circuit court's determinations of credibility and the weight to be afforded testimony, as we are bound to do. *See Huffman II, supra.*

### Conclusion

The majority has found that the circuit court committed reversible error as to each of the six *Huffman* factors. In each instance, the majority is not content to reverse and remand to the circuit court for reconsideration based on what it deems to be a correct analysis. Rather, the majority has installed itself as a "super trial court" for the purpose of deciding whether the name-change petition should be granted. Respectfully, the idea that appellate judges might have reached a different decision had they been presiding at trial should not be the standard for holding circuit-court findings-of-fact clearly erroneous. Because I believe that the circuit court's decision should be affirmed, or at least remanded for further consideration in light of any alleged error, I respectfully dissent.

I am authorized to state that Judge ROAF joins in this dissent.